**Robert REGAN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**STORED VALUE CARDS, INC. and Central National Bank And Trust Company, Enid, Oklahoma, Defendants.**

**Civil Action No. 1:14–CV–01187–AT.**

United States District Court, N.D. Georgia, Atlanta Division.

Signed Jan. 13, 2015.

Edward Adam Webb, Matthew C. Klase, Webb, Klase & Lemond, LLC, Atlanta, GA, Robert H. Stansfield, Greer, Stansfield & Turner, LLP, Covington, GA, for Plaintiff.

Jessica L. Nelson, Russell S. Ponessa, Hinshaw & Culbertson, LLP, Minneapolis, MN, Brenton Sewell Bean, Hawkins Parnell Thackston & Young, LLP, Atlanta, GA, for Defendants.

### *ORDER*

AMY TOTENBERG, District Judge.

This matter is before the Court on Defendants' Motion to Compel Arbitration and Stay or Dismiss Proceedings [Doc. 7] pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. Defendants contend that Plaintiff is bound by a contractual arbitration agreement arising from Plaintiff's use of a prepaid debit card. As material factual disputes exist regarding the formation of the contract containing the arbitration agreement, Defendants' Motion is **DENIED.**

## I. LEGAL STANDARD

■ Defendant has asked the Court to compel arbitration under Sections 3 and 4 of the FAA. (Doc. 7–1 at 1.) As a starting place, the Court is "mindful of the Supreme Court's instruction that 'arbitration is simply a matter of contract.'" *Dasher v. RBC Bank (USA),* 745 F.3d 1111, 1116 (11th Cir.2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 144, 190 L.Ed.2d 231 (2014) (citing *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). Due to the contractual nature of arbitration, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *see also Chastain v. Robinson–Humphrey Co., Inc.,* 957 F.2d 851, 854 (11th Cir.1992). A court must first consider "any formation challenge to the contract containing the arbitration clause," *Solymar Invs., Ltd. v. Banco Santander S.A.,* 672 F.3d 981, 990 (11th Cir.2012), because "a party plainly cannot be bound by an arbitration clause to which it does not consent." *BG Grp., PLC v. Republic of Argentina,* —— U.S. ——, 134 S.Ct. 1198, 1213, 188 L.Ed.2d 220 (2014) (citing *Granite Rock Co. v. Teamsters,* 561 U.S. 287, 299, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010)). Section 4 of the FAA is clear on this point: "If the making of the arbitration agreement [is] in issue, the court shall proceed summarily to the trial thereof"—as opposed to ordering arbitration pursuant to that agreement. 9 U.S.C. § 4.[1]

---

1. If the challenge to the contract came in some other form, *e.g.,* enforceability, voidability, or some other equitable defense, that challenge would be the type that "is for the arbitrator to decide." *Nitro–Lift Techs., L.L.C. v. Howard,* —— U.S. ——, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012) (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)).

 Unless there is clear and unambiguous evidence that the parties agreed to have an arbitrator decide disputes over contract formation, *Martinez v. Carnival Corp.*, 744 F.3d 1240, 1246 (11th Cir.2014) (quoting and citing *Rent–A–Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69, 79, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010)), such "gateway" issues of "arbitrability" are "for a court to decide." *BG Grp.*, 134 S.Ct. at 1213 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)). And while "the validity of an arbitration agreement is generally governed by the Federal Arbitration Act," "state law generally governs whether an enforceable contract or agreement to arbitrate exists" at all. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68 (11th Cir.2005).[2] A genuine dispute of fact concerning contract formation precludes a court from deciding as a matter of law that the parties did or did not enter into an agreement to arbitrate. *See Granite Rock Co. v. Teamsters*, 561 U.S. at 297–99, 130 S.Ct. 2847 (holding that the district court must first "resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce"); *Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 989–90 (11th Cir.2012); *Magnolia Capital Advisors, Inc. v. Bear Stearns &* *Co.*, 272 Fed.Appx. 782, 785–86 (11th Cir. 2008). Finally, "a district court considering the making of an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences that may arise." *Id.* at 786 (internal quotation marks omitted).

## II. FACTUAL BACKGROUND

On January 15, 2014, Plaintiff, a 67 year old man, was arrested based on a warrant sworn out by a local merchant,[3] jailed overnight at the Rockdale County Jail ("Rockdale"), and then released the next day. (Compl. ¶¶ 38, 40.) When he was booked, the officers at Rockdale took the $764.00 in cash he had on his person. (*Id.* ¶ 39.) When he was released, the officers did not give him cash, but rather "assigned" him a Numi Prestige Prepaid Mastercard (the "Card") loaded with the same amount of money. (Pl.'s Resp. Ex. A ¶ 11, Decl. of Robert Regan, Doc. 12–1.) Plaintiff did not want the Card, but he "was not given any option of receiving [his] $764.00 in cash or by check." (*Id.* ¶¶ 15–16.)

After the officers—who are not parties to this suit—handed Plaintiff the Card, they handed him "numerous" documents pertaining to his arrest, booking, and release. (*Id.* ¶¶ 12–13.) Among these numerous documents was a very fine print

---

**2.** The contract at issue here contains a governing law clause stating that Oklahoma law applies to the interpretation and enforcement of the contract. (Doc. 18–1 ¶ 30.) Generally, federal courts respect contractual governing law provisions. "However, a court cannot sensibly apply a contractual choice-of-law provision before the court determines that the parties have a valid contract." *Williams v. Gen. Elec.*, 13 F.Supp.3d 1176, 1180 n. 5 (N.D.Ala.2014) (internal citations omitted). It is undisputed that the acts potentially giving rise to the contract at issue occurred in Georgia. "Under the [Georgia] rule of *lex loci contractus*, the validity ... of a contract [is] governed by the substantive law of the state where the contract was made." *Federated Rural Elec. Ins. Exch. v. R.D. Moody & Assocs., Inc.*, 468 F.3d 1322, 1325 (11th Cir. 2006) (quoting *Fed. Ins. Co. v. Nat'l Distrib. Co., Inc.*, 203 Ga.App. 763, 417 S.E.2d 671, 673 (1992)) (internal citations omitted). Accordingly, Georgia law governs the contract formation issue here.

**3.** Plaintiff alleges that the warrant contained "bogus" charges that were subsequently dismissed and that he has no criminal history. (Doc. 1–1 at ¶¶ 37–38.)

"Cardholder Agreement Terms & Conditions" (the "Cardholder Agreement") for the Card containing a binding arbitration provision and detailing the fees applicable to various Card uses.[4] (Def.'s Mot. Ex. A, Decl. of Brad D. Golden Ex. 2, Doc. 7–2 at 9–10.) At the time, Plaintiff did not realize the Cardholder Agreement was a part of the packet of documents he received, at least partially because the officers "did not comment on the purpose or importance of the [Cardholder Agreement] or make any effort to distinguish [it] from the numerous other documents they gave [him]." (Regan Decl. ¶ 13.) In fine print, the back of the Card also states, "Use of this card constitutes acceptance of all terms and conditions as set forth in the Cardholder Agreement." (Golden Decl. Ex. 1, Doc. 7–2 at 7.)

Plaintiff, who "had seldom ever used an ATM card in past," (Compl. ¶ 44), then attempted to retrieve his money off of the Card. First, he went directly to his bank to obtain a release of his cash. (Regan Decl. ¶ 18.) He asked the teller if he could simply exchange the Card for cash. (Regan Decl. ¶ 20.) He was told he could not because his name was not imprinted on the Card. (Id.) The bank teller advised him he could only retrieve his money by using the Card in various other ways, which Plaintiff then proceeded to do: namely, ATM withdrawals in the daily-maximum amount and point-of-sale purchases, with each transaction triggering a use fee. (Id. ¶¶ 20–30.) In doing so, Plaintiff incurred some $16.00 in fees in accordance with the terms of the Cardholder Agreement. (Id.) Plaintiff likely also was charged an account maintenance fee for the two or so weeks the card had money on it. (Id. ¶ 29–30.) The company that supplies the cards to the jail would have charged this maintenance fee in accordance with the terms of the Cardholder Agreement. Plaintiff's Complaint alleges that the costs of this prepaid debit card program are passed on to the released inmates in the form of these and other high fees, even though Plaintiff and other ex-inmate "customers" have not voluntarily enrolled in the program or entered into a contract for such services and fees. (Compl. ¶¶ 23–30.)

Defendant Stored Value Cards, Inc. ("SVC") is a company that acts as an intermediary between the banks that issue these prepaid cards and jails that have chosen to use these cards as a replacement for the tried and true practice of refunding inmates' their personal cash upon release to inmates.[5] (Id. ¶¶ 2, 13–15) Defendant Central National Bank and Trust Company ("CNB") is one such issuing bank. (Id. ¶ 3.) In this particular case, SVC contracted with a third-party, which then contracted with the Rockdale County Sheriff's Department. (Golden Decl. ¶ 6.) As a result, SVC supplied Rockdale County Jail with a CNB-issued card—the Card at issue here—which was then assigned to Plaintiff upon his release from jail.

On March 17, 2014, Plaintiff filed a putative class action against Defendants in the Superior Court of Rockdale County, Geor-

---

4. The Court takes a moment to point out that the terms of the Cardholder Agreement are almost illegible due to the miniscule size of the font. The Cardholder Agreement initially filed with the Court, the same one that is given to newly released inmates, constitutes 2 pages with almost nonexistent margins. (Doc. 7–2.) As a result, the Court ordered Defendants to provide the Court with a reformatted version of the Cardholder Agreement. The reformatted version, in size 13 font and with similarly scant margins, occupies 10 full pages. (Doc. 18–1.)

5. According to the Complaint, SVC markets these prepaid cards to detention facilities in what it describes as "a revolutionary solution for the return of inmate funds." (Doc. 1–1 at ¶ 15.)

gia. (*See* Compl.) Plaintiff claims he, and not Defendants, is entitled to the fees charged to him for his use of the Card. Plaintiff seeks declaratory and injunctive relief, as well as damages for unjust enrichment, conversion, and unconstitutional deprivation of property without due process of law in violation of 42 U.S.C. § 1983. (*Id.* ¶¶ 64–96.) On April 22, 2014, the action was removed to federal court on the basis of federal question jurisdiction and pursuant to the Class Action Fairness Act. (*See* Doc. 1.) Five days after removal, Defendants filed the Motion to Compel [Doc. 7] currently before the Court.

### III. Discussion

Defendants urge the Court to compel arbitration for multiple reasons. First, Defendants allege that Plaintiff is a party to the binding arbitration clause within the Cardholder Agreement. (Mot. to Compel at 16–17.) Defendants argue that the Cardholder Agreement is valid under both Oklahoma and Georgia law, (*id.* at 17–20), and that Plaintiff agreed to the terms of the Cardholder Agreement by accepting and using the card. (*Id.* at 17–23.) Defendants also contend that Plaintiff failed to opt out of arbitration, as allowed in theory under the Cardholder Agreement. (*Id.* at 11–12.)

In addition, Defendants argue that, though the arbitration agreement is not unconscionable, even if it were, "alleged unconscionability does not preclude enforcement of the Arbitration Provision...." (*Id.* at 20–23.) Defendants urge the Court to require the question of the enforceability of the entire cardholder agreement to be submitted to an arbitrator. (*Id.* at 23–24.)

■ Defendants' arguments miss the mark. To start, when "it is undisputed that the party seeking to avoid arbitration has not signed any contract requiring arbitration" and "is challenging the very existence of *any* agreement, *including the existence of an agreement to arbitrate* ... there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the Act." *Chastain,* 957 F.2d at 854. In such cases, the district court must decide whether the parties are bound by the arbitration provision of the purported agreement. (*Id.* at 854–855.) To sufficiently place contract formation at issue, Plaintiff must: (1) unequivocally deny that the agreement (containing the arbitration clause) was made; and (2) "must substantiate the denial of the contract with enough evidence to make the denial colorable." *Id.* at 855. Plaintiff has done so, and Defendants have not offered any evidence directly rebutting Plaintiff's claims.

■ Satisfying step 1 of the *Chastain* test, Plaintiff alleges he never assented to the terms of the contract. Georgia law requires the assent of both parties in order to form a contract. *See* O.C.G.A. §§ 13–3–1, 13–3–2. Assent in this context requires "(a) a meeting of the minds (b) on the essential terms of the contract." John K. Larkins, Jr., Ga. Contracts Law and Litigation § 3:2 (2d ed.).

■ The Georgia standard for ascertaining mutual assent, as set out in *Legg v. Stovall Tire & Marine,* is an objective one:

> In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby *one party's intention is deemed to be that meaning a reasonable person in the position of the other contracting party would ascribe to the first party's manifestations of assent,* or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.

245 Ga.App. 594, 538 S.E.2d 489, 491 (2000) (emphasis added) (citing to *Cox*

*Broad. Corp. v. NCAA*, 250 Ga. 391, 297 S.E.2d 733, 737 (1982)). "In making that determination, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence." *Frickey v. Jones*, 280 Ga. 573, 630 S.E.2d 374, 376 (2006).

Satisfying Step 2 of the *Chastain* test, Plaintiff has offered a "supporting affidavit[ ], which in most cases would be sufficient to require a jury determination of whether there had in fact been a meeting of the minds." *Garcia v. Mason Contract Prods., LLC,* No. 08–23103–CIV, 2009 WL 1851131, at *2 (S.D.Fla. June 29, 2009) (internal quotation marks omitted) (finding affidavit denying formation of contract sufficient substantiation under step 2 of *Chastain* test). In that affidavit, Plaintiff describes the following facts and factors a reasonable person might consider: His cash was taken from him on Day 1 upon his arrest, and on Day 2 upon release he was given the prepaid card instead. (Regan Decl. ¶¶ 8, 11.) He was not given an opportunity to reject the card. (*Id.* ¶¶ 11, 15, 16.) He was not asked if he would like cash or a check instead. (*Id.*) He was not advised that the Card came with a Cardholder Agreement. (*Id.* ¶ 13.) He was not given the Cardholder Agreement before being given the card, and was never told that the Cardholder Agreement lurked somewhere in the numerous papers he was given upon discharge. (*Id.*) He did not

sign the Cardholder Agreement. (*Id.*) Based on Plaintiff's sworn statements— and the failure of Defendants to offer, at this stage, any directly contradictory evidence [6]—an issue of fact remains as to the meaning "a reasonable person in [Defendants' position] would ascribe to [Plaintiff's alleged] manifestations of assent." *Legg,* 538 S.E.2d at 491; *see also Frickey,* 630 S.E.2d at 376 (holding that "courts are free to consider such extrinsic evidence" in making mutual assent determination).

Defendants focus on the theory that "acceptance may be inferred by part performance or other facts, such as acceptance of benefits or performance." Larkins, Ga. Contracts Law and Litigation § 3:3. Indeed, it is true that, under certain circumstances, the very use of a credit card may constitute assent to or acceptance of the terms of that card's cardholder agreement, including any arbitration provision. *See, e.g., Benedict v. State Farm Bank,* 309 Ga.App. 133, 709 S.E.2d 314, 319 (2011); *Athon v. Direct Merchants Bank,* No. 5:06–CV–1–CAR, 2007 WL 1100477 at *2– 3 (M.D.Ga. April 11, 2007); *Read v. Gulf Oil Corp.,* 114 Ga.App. 21, 150 S.E.2d 319, 319 (1966). Defendants argue, based primarily on these cases, that it is "long-established Georgia law that a party's use of a credit card undisputedly demonstrates assent to and acceptance of its terms and conditions." (Reply at 5.)

Defendants might be right if the facts of this case were not so markedly different from the facts of the cases upon which

---

**6.** Defendants' only evidence that the above facts may not have occurred is a generic statement by the President of Stored Value Cards, Inc., that, "Detention Facilities which offer SVC's cards are not obligated by SVC to use SVC's stored value cards as the exclusive form by which they return confiscated funds to released inmates, and are free to utilize other forms such as cash or check *in addition to* stored value cards." (Golden Decl. ¶ 7

(emphasis added).) However, stating that detention facilities are free to utilize other forms of payment *in addition to* stored value cards both: A) does not show that detention facilities are free to use other forms of payment *instead of* stored value cards; and B) moreover, does not directly contradict any facts presented by Plaintiff about what actually happened.

they rely. Unlike in *Read, Benedict,* and *Athon,* Plaintiff here did not make an application for the Card, he was not offered a line of credit that he could choose to use or not to use, he did not receive the Cardholder Agreement in the same envelope as the Card, and he had not used the card for a long period of time and made payments on the Card. Analogizing to cases containing these facts is not persuasive.

Defendants' cited authority is even less persuasive due to another distinguishing factor: Plaintiff received the Card while he was being discharged *from jail, i.e. from a condition of absence of liberty of choice which Defendant reasonably could have anticipated.* Plaintiff was taken into custody and his money was taken from him by officers of the Rockdale County Jail. As he was being discharged, his money was given back by other officers in the form of a prepaid debit card. It is understandable—and supported by affidavit—that he did not believe he had a choice about the form in which his money was returned to him. In Plaintiff's own words: "I was not given any option of receiving my $764.00 in cash or by check. As everything else I had experienced during my night in jail, I was told what to do by the jailers and was not given an option or opportunity to reject." [7] (Regan Decl. ¶ 16.)

Giving Plaintiff the benefit of all reasonable doubts and inferences, *Magnolia Capital Advisors,* 272 Fed.Appx. at 786, material fact issues surrounding contract formation preclude the Court from deciding as a matter of law that the parties did or did not enter into the agreement to arbitrate. *See id.* at 785–86; *Mullinax v. United Mktg. Grp., L.L.C.,* 2011 WL 4085933 at *8, No. 1:10–cv–03585–JEC (N.D.Ga. Sept. 13, 2011) (denying Defendant's motion to compel arbitration where Plaintiff denied his entry into an electronic agreement and its arbitration provision and finding that that "[o]nly when there is no genuine issue of fact concerning the formation of the [arbitration] agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.") (citations omitted). The circumstances surrounding the receipt of the Card and Cardholder Agreement, the absence of Plaintiff's signature (at least on the Cardholder Agreement),[8] the language on the back of the Card and in the Cardholder Agreement, and Plaintiff's actions throughout do not permit the Court to decide, as a matter of law, that a reasonable person in Defendants' position

---

7. To be clear, Plaintiff's statements are considered solely for the purpose of determining whether a contract was formed as a matter of law. The statements are not being considered for other purposes, for example, as evidence of an equitable defense regarding the validity and voidability of the contract—an issue properly addressed by an arbitration panel *if* the Court determinates that a contract was formed. *See Chastain,* 957 F.2d at 855; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that if the making of the arbitration agreement is an issue "the federal court may proceed to adjudicate it").

8. The documents before the Court are silent as to whether Plaintiff signed the back of the Card, yet there is an apparent inconsistency on the back of the Card itself regarding whether a signature is required. On the one hand, the back of the card states that the card must be signed to be valid and the Cardholder Agreement suggests the same. (Doc. 7–2.) On the other, the back of the card states that "[u]se of this card constitutes acceptance of all terms and conditions as set forth in the Cardholder Agreement." (*Id.*) These very terms seem to contradict each other. If a card is not valid due to lack of a signature, how can its use constitute acceptance of an offer or create a binding contract? Alternatively, if an unsigned card can create a binding contract by its use, what is the purpose of requiring a valid signature?

would ascribe to Plaintiff's actions acceptance or, perhaps later, ratification of the Cardholder Agreement. Until the Court or a jury resolves the question of contract formation, "the district court has no authority to compel the arbitration" of this dispute. *Chastain,* 957 F.2d at 856.[9]

## IV. CONCLUSION

For the foregoing reasons, "the making of the arbitration agreement [is] in issue." 9 U.S.C. § 4. Defendants' Motion to Compel Arbitration and Stay or Dismiss Proceedings [Doc. 7] is therefore **DENIED** without prejudice to its potential right to renew after subsequent proceedings.[10]

---

**9.** As a result, the Court does not reach the questions of whether Plaintiff could have opted out of the arbitration provision or whether the contract or any part thereof is unconscionable.

**10.** It appears the parties have operated under a self-imposed stay pending the Court's consideration of Plaintiff's Motion to Stay Certain Pretrial Deadlines [Doc. 13]. That Motion is **GRANTED NUNC PRO TUNC.** The stay should now be deemed ***LIFTED.***